IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

UNITED STATES OF AMERICA

vs.   Case Nos.:   5:11cr6/RS/EMT
                  5:12cv60/RS/EMT

JESUS V. HERNANDEZ

## REPORT AND RECOMMENDATION

This matter is before the court upon Defendant's motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (doc. 32).  The Government filed a response (doc. 38), and Defendant filed a reply (doc. 40).  The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b).  The court held an evidentiary hearing in this case on February 21, 2014.  After a careful review of the record and the arguments presented, and consideration of the evidence presented at the hearing, it is the opinion of the undersigned that Defendant's motion should be denied.

## PROCEDURAL BACKGROUND

Defendant was charged in a three-count indictment with possession with intent to distribute a substance containing a detectable amount of marijuana (Count One), and two counts of selling or disposing of a firearm to an individual Defendant knew or had reasonable cause to believe had been convicted of a felony (Count Two and Count Three) (doc. 1).  Represented by appointed counsel Charles William Lammers, Defendant entered a plea of guilty pursuant to a written agreement and statement of facts (docs. 19–20).  The plea agreement did not specify the quantity of drugs for which Defendant would be held accountable, but it did provide that Defendant faced a maximum of five-years imprisonment on Count One and a maximum of ten-years imprisonment on Counts Two and

Three (doc. 19 at 1). Defendant was advised that any prediction of the sentence that might be imposed was not binding and that he reserved the right to appeal (*id*. at 2–3).

The plea proceeding was unremarkable (doc. 55). Defendant stated that he had grown up in Dover, Florida, near Tampa; that he dropped out of school in the eighth grade; and that although he had attended a community college, he did not receive a General Educational Development ("GED") diploma (doc. 55 at 4–5). He further stated that he was working as a laborer and had been treated for drug addiction in the past (*id*. at 5–6). Defendant affirmed that he understood the rights he was giving up by pleading guilty, including any defense he might have to the charges (*id*. at 6–8). He also stated he understood the charges against him and the vagaries of the Sentencing Guidelines, and he admitted that the facts set forth in the statement of facts were true (*id*. at 8–13).[1] Defendant also admitted that he was pleading guilty of his own free will because he was, in fact, guilty (*id*. at 14). He further indicated that he had adequate time to discuss his case with Mr. Lammers and that he had no complaints regarding Mr. Lammers' representation (*id*. at 14–15). The court accepted Defendant's guilty plea to the three charges (*id*. at 16–17).

The draft Presentence Investigation Report ("PSR") was disclosed to the defense on April 28, 2011 (doc. 23), and the final PSR, which did not include character reference letters that had been included with the draft PSR, was docketed on May 25, 2011 (doc. 24). Defendant's base offense level was 14 for the firearm offenses (PSR ¶ 19). He received a four-level upward adjustment due to his trafficking in firearms and another four-level upward adjustment due to his possession of the firearms in connection with another felony offense (PSR ¶¶ 20, 21). After a three-level reduction for acceptance of responsibility, his total offense level was 19 (PSR ¶¶ 26, 28). His Criminal History Category was II, and his advisory guidelines range was 33 to 41 months (PSR ¶¶ 36, 67).

Defendant was sentenced on June 1, 2011. At sentencing, counsel advised the court that Defendant faced "severe possible collateral consequences" as a result of his conviction (doc. 47 at 4). Counsel noted that Defendant was a citizen of Mexico who had a wife and four children in the United States and that Defendant had been in the United States since the age of four, so "if" he was

---

[1] Defendant does not appear to have been responding in a rote manner, as the record reflects that when the court asked Defendant if he understood the meaning of supervised release, Defendant promptly responded that he did not (doc. 55 at 12–13).

deported he would be separated from his family and thrust into a potentially dangerous situation in Mexico because he had no contact with his family in Mexico (*id*.). In asking for a sentence below the guidelines, counsel noted that there was a "very real likelihood that a hold will be placed on [Defendant] and he will be deported" (*id*.). Defendant was sentenced to a term of 37-months imprisonment on each count, to be served concurrently (*id*. at 7). The court advised Defendant of his right to appeal and of the fact that a notice of appeal must be filed within fourteen days (*id*. at 9). The court also advised Defendant: "if you request, the court clerk will immediately file a notice of appeal on your behalf" (*id*.). Defendant was allowed to self surrender, and he did so on July 5, 2011 (*see* doc. 28).

After the filing of the judgment and related documents, nothing further was filed in this case until mid-February 2012, when Defendant filed a "Motion to Inquiry" (doc. 29). In this motion, Defendant requested information about the status of his appeal. More specifically, he stated (without alteration): "Jesus Hernandez . . . submit this Motion of Inquiry requesting that he be advised as to the status of his appeal filed by . . . Mr. Charles Lammers (AFPD). Petition submitted on or about June 8, 2011 but until date Hernandez have not information regarding with this appeal" (*id*. at 1). The court entered an order directing counsel to respond to Defendant's inquiry no later than March 9, 2012 (doc. 30). The instant motion to vacate was filed pursuant to the prison mailbox rule[2] on March 6, 2012 (doc. 32 at 6). In this motion Defendant raises three claims of ineffective assistance of counsel. He asserts that counsel was constitutionally ineffective because he failed to file an appeal as instructed, failed to raise an entrapment defense, and failed to advise him of the potential immigration consequences of pleading guilty.

---

[2] A pro se inmate's pleading is deemed filed at the time it is placed in the prison mailbox or delivered to prison authorities for mailing. *See* Houston v. Lack, 487 U.S. 266 (1988) (holding that a pro se inmate's notice of appeal was filed as of the time he placed it in the prison mailbox, thus creating the "prison mailbox rule"); Williams v. McNeil, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009) (under the 'prison mailbox rule,' a pro se prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing); Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001) (absent evidence to the contrary, court assumes that a pro se petition is delivered to prison authorities for mailing the date it was signed).

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT

LEGAL ANALYSIS

General Standard of Review

Because collateral review is not a substitute for direct appeal, the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited. A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a); McKay v. United States, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011). "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). The "fundamental miscarriage of justice" exception recognized in Murray v. Carrier, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent . . . ."

The law is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct appeal. Rozier v. United States, 701 F.3d 681, 684 (11th Cir. 2012); United States v. Nyhuis, 211 F.3d 1340, 1343 (11th Cir. 2000); Mills v. United States, 36 F.3d 1052, 1056 (11th Cir. 1994). Once a matter has been decided adversely to a defendant on direct appeal, it cannot be re-litigated in a collateral attack under section 2255. Nyhuis, 211 F.3d at 1343 (quotation omitted). Broad discretion is afforded to a court's determination of whether a particular claim has been previously raised. Sanders v. United States, 373 U.S. 1, 16 (1963) ("identical grounds may often be proved by different factual allegations . . . or supported by different legal arguments . . . or couched in different language . . . or vary in immaterial respects").

Furthermore, a motion to vacate under section 2255 is not a substitute for direct appeal, and issues which could have been raised on direct appeal are generally not actionable in a section 2255 motion and will be considered procedurally barred. Lynn, 365 F.3d at 1234–35; Bousley v. United States, 523 U.S. 614, 621 (1998); McKay v. United States, 657 F.3d 1190, 1195 (11th Cir. 2011). An issue is "'available' on direct appeal when its merits can be reviewed without further factual

development." Lynn, 365 F.3d at 1232 n.14 (quoting Mills, 36 F.3d at 1055). Absent a showing that the ground of error was unavailable on direct appeal, a court may not consider the ground in a section 2255 motion unless the defendant establishes (1) cause for not raising the ground on direct appeal, and (2) actual prejudice resulting from the alleged error, that is, alternatively, that he is "actually innocent." Lynn, 365 F.3d at 1234; Bousley, 523 U.S. at 622 (citations omitted). To show cause for procedural default, a defendant must show that "some objective factor external to the defense prevented [him] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [defendant's] own conduct." Lynn, 365 F.3d at 1235. A meritorious claim of ineffective assistance of counsel can constitute cause. *See* Nyhuis, 211 F.3d at 1344.

Ineffective assistance of counsel claims are generally not cognizable on direct appeal and are properly raised by a § 2255 motion regardless of whether they could have been brought on direct appeal. Massaro v. United States, 538 U.S. 500, 503 (2003); *see also* United States v. Patterson, 595 F.3d, 1324, 1328 (11th Cir. 2010). The benchmark for judging a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). To show a violation of his constitutional right to counsel, a defendant must demonstrate both that counsel's performance was below an objective and reasonable professional norm and that he was prejudiced by this inadequacy. Strickland, 466 U.S. at 686; Williams v. Taylor, 529 U.S. 362, 390 (2000); Darden v. United States, 708 F.3d 1225, 1228 (11th Cir. 2013). Strickland's two part test also applies to guilty pleas. Hill v. Lockhart, 474 U.S. 52, 58 (1985). A defendant will be required to show that but for counsel's errors, he would not have pleaded guilty and would have instead insisted on proceeding to trial. *Id.* at 59. In applying Strickland, the court may dispose of an ineffective assistance claim if a defendant fails to carry his burden on either of the two prongs. Strickland, 466 U.S. at 697; Brown v. United States, 720 F.3d 1316, 1326 (11th Cir. 2013).

In determining whether counsel's conduct was deficient, this court must, with much deference, consider "whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688; *see also* Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007). Reviewing courts are to review counsel's performance in a highly

deferential manner and "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." Hammond v. Hall, 586 F.3d 1289, 1324 (11th Cir. 2009) (quoting Strickland, 466 U.S. at 689); *see also* Chandler v. United States, 218 F.3d 1305, 1315–16 (11th Cir. 2000) (discussing presumption of reasonableness of counsel's conduct); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation"). Counsel's performance must be evaluated with a high degree of deference and without the distorting effects of hindsight. Strickland, 466 U.S. at 689. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); Chandler, 218 F.3d at 1315. When examining the performance of an experienced trial counsel, the presumption that counsel's conduct was reasonable is even stronger, because "[e]xperience is due some respect." Chandler, 218 F.3d at 1316 n.18.

With regard to the prejudice requirement, defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. Strickland, 466 U.S. at 694. For the court to focus merely on "outcome determination," however, is insufficient; "[t]o set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." Lockhart v. Fretwell, 506 U.S. 364, 369–70 (1993); Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 754 (11th Cir. 2010). A defendant therefore must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Lockhart, 506 U.S. at 369 (quoting Strickland, 466 U.S. at 687). Or in the case of alleged sentencing errors, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been less harsh due to a reduction in the defendant's offense level. Glover v. United States, 531 U.S. 198, 203–04 (2001). A significant increase in sentence is not required to establish prejudice, as "any amount of actual jail time has Sixth Amendment significance." *Id.* at 203.

To establish ineffective assistance, Defendant must provide factual support for his contentions regarding counsel's performance. Smith v. White, 815 F.2d 1401, 1406–07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the Strickland

test.  *See* Boyd v. Comm'r, Ala. Dep't of Corr., 697 F.3d 1320, 1333–34 (11th Cir. 2012); Garcia v. United States, 456 F. App'x 804, 807 (11th Cir. 2012) (citing Yeck v. Goodwin, 985 F.2d 538, 542 (11th Cir. 1993)); Wilson v. United States, 962 F.2d 996, 998 (11th Cir. 1992); Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991); Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990) (citing Blackledge v. Allison, 431 U.S. 63, 74 (1977)).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail . . . are few and far between." Chandler, 218 F.3d at 1313.  This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted.  Dingle, 480 F.3d at 1099; Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000).  "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'"  Dingle, 480 F.3d at 1099 (quoting Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983)).  The Sixth Circuit has framed the question as not whether counsel was inadequate, but rather whether counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory."  United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992).

**Ground One:  Failure to File an Appeal**

The issue of counsel's duty and obligation with respect to his client's right to appeal has been well litigated.  The Supreme Court has unequivocally stated that if a defendant specifically instructs his attorney to file a notice of appeal, a lawyer who disregards this instruction acts in a manner that is professionally unreasonable.  Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (citing Rodriguez v. United States, 395 U.S. 327 (1969); Peguero v. United States, 526 U.S. 23, 28 (1999)).  Since a defendant whose lawyer fails to file an appeal upon request has been denied an entire judicial proceeding, prejudice is presumed and the defendant is entitled to a belated appeal.  *Id*. at 483; Gomez-Diaz v. United States, 433 F.3d 788, 792 (11th Cir. 2005);  Cunningham v. United States, 378 F. App'x 955, 957 (11th Cir. 2010).

However, in cases where a defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, counsel's performance can still be constitutionally deficient if counsel failed

in his or her duty to consult with the defendant regarding an appeal. Flores-Ortega, 528 U.S. at 478. Consultation involves "advising the defendant about the advantages and disadvantages of taking an appeal, and making a reasonable effort to discover the defendant's wishes." *Id.*  If counsel has consulted with the defendant, of course, the question of deficient performance is easily answered; counsel performs in a professionally unreasonable manner only by failing to follow the defendant's express instructions with respect to an appeal. *Id.*  In this case, consultation is not at issue. Rather, Defendant asserts that he expressly instructed counsel to file an appeal and counsel failed to follow this instruction.

The Written Record

In the affidavit Defendant submitted in conjunction with his § 2255 motion, he attests that at the conclusion of the "June 8 [sic], 2011" sentencing,[3] he requested that counsel file an appeal (doc. 32 at 35). He states that he was "not in accord with the exaggerated and excessive sentences of 37 months considering that [he] was victim of an entrapment by undercover ATF and two confidential informants" (*id.*). Defendant further states that on June 20, 2011, he asked his wife to call counsel to inquire about the status of his appeal (*id.*).

Defendant's wife, Nicole Kirkland, also submitted an affidavit in support of Defendant's motion (doc. 32 at 37). Ms. Kirkland avers that she attempted to contact counsel on June 16, 2011, regarding Defendant's appeal (*id.*). She was unable to speak to counsel, and left a message (*id.*). She contacted counsel again on June 20, 2011, and counsel told her that he could only file a Notice of Appeal because the Court of Appeals would assign appellate counsel to submit a brief and that "in a few days he would send the Notice of Appeal to the clerk of the court" (*id.*).

The Government submitted the affidavit of defense counsel (Mr. Lammers) in opposition to Defendant's motion (doc. 38-1 at 2–6[4]). In his affidavit, counsel states that according to his memory and notes, immediately after sentencing on June 1, 2011, he and Defendant went to counsel's office

---

[3] As previously noted, Defendant was sentenced on June 1, 2011.

[4] The statements by Mr. Lammers, recited in this paragraph, are all derived from this affidavit (doc. 38-1 at 2–6).

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT

to discuss the issue of an appeal.[5] After discussing Defendant's appeal options, Defendant stated that he was not certain he wanted to appeal and that he would decide later. Counsel reminded Defendant that there was a limited time period in which to file an appeal, and he informed Defendant that he would not file an appeal unless Defendant specifically directed him to do so. Counsel also instructed Defendant that if he decided he wished to file an appeal to immediately call counsel, call the clerk of court, and follow up the request in writing. Counsel notes that Defendant never contacted him or told him to file an appeal at any time after the June 1, 2011 sentencing. Therefore, on June 25, 2011, counsel sent a letter to Defendant at his home address reminding him of his sentence and self-surrender date, and stating that counsel had not filed a Notice of Appeal because he had not been instructed to do so. Counsel received no response from Defendant, and Defendant never contacted him to contradict counsel's statement regarding the notice of appeal. Counsel notes that he was aware of the affidavit submitted by Defendant's wife, but he states that he has no memory of or notes reflecting "any conversation with [Defendant's] spouse concerning this alleged phone conversation." Counsel also has neither memory of nor notes regarding any messages left for him by Defendant's spouse directing him to file a Notice of Appeal.

In his reply, Defendant asserts that he told Mr. Lammers twice during a conversation with him in his office that he wanted to appeal, to which Mr. Lammers responded "you don't have to decide today" (doc. 40 at 11). Defendant also claims that the portion of counsel's affidavit in which counsel refers to "appeal options" is false because counsel only discussed a single option (*id*. at 11–12). Defendant admits having received the letter of "June 25, 2010 [sic]" referenced by counsel in his affidavit, and appends the letter to his reply, but he states that by the time he received the letter the time period for filing the notice of appeal had expired (doc. 40 at 31).

The Evidentiary Hearing

Defendant was the only witness to appear in his behalf at the evidentiary hearing. He testified that after sentencing he talked to Mr. Lammers in his office at the courthouse, and he told counsel to appeal. Defendant testified that Mr. Lammers told him he did not have to decide that day, but then Mr. Lammers essentially changed the subject and rushed Defendant out of his office.

---

[5] As previously noted, Defendant was allowed to self surrender and thus was not in custody at this point.

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT

Defendant testified that he wanted to appeal, but at the time he was not certain what to appeal because he was overwhelmed and confused about his case. In response to a question from his (evidentiary hearing) counsel, Defendant stated he had complaints about his sentence. He also testified that he never contacted counsel again after the meeting in the courthouse because Defendant was working at the time and because he expected counsel to file an appeal. He did say that he asked his wife, Nicole Kirkland, to contact counsel but that she was not successful.

Defendant was asked about counsel's letter dated June 25, 2011 (doc. 38-1 at 8). He testified that when he received the letter he felt that all was lost, and in accordance with the letter he did not think that his appeal was pending. In response to another question from his counsel, Defendant noted that he had "no reaction" to the letter, but that he had his wife call counsel.

Counsel also asked Defendant about the "Motion to Inquiry" that he filed in February of 2012. Defendant said that he filed it because he did expect counsel to file a notice of appeal. Defendant testified that, contrary to the information he admittedly learned from counsel's letter of June 25, 2011, he thought that his appeal was pending.

On cross-examination, Defendant admitted he was allowed to self surrender on July 5, 2011, over one month after sentencing, and that during that time he was free to see Mr. Lammers, see the clerk, and file the appeal. Defendant, however, did none of those things because he thought it would be sufficient to request Mr. Lammers to file the notice of appeal.

Defendant admitted that there was no communication issue (i.e., due to language barriers), between him and his attorney. He said that Mr. Lammers was a good attorney and clarified that the only issue with communication was when counsel disregarded his request regarding an appeal. Defendant stated that he had hoped to be sentenced only to probation, although he realized his sentence was within the advisory guideline range. Defendant said that his wife was with him at sentencing and when he met with Mr. Lammers after sentencing, and he reiterated that counsel rushed him and his wife out of counsel's office and that they only spoke for five minutes. Defendant was asked whether his trial counsel asked him if he wanted to appeal, and in response he said "no." Defendant denied this, stating that he did not tell his counsel that he did not want to appeal.

Defendant also testified that what was stated in counsel's letter of June 25, 2011 (i.e., that he had told counsel he did not want to appeal) was not true. He stated that his wife contacted Mr.

Lammers on June 19th or 20th, before the letter was written, to find out the status of the appeal. Defendant testified that he could not recall exactly when he received counsel's June 25, 2011 letter, but he noted that he received it after the expiration of the fourteen-day period for filing the appeal. Defendant was unclear about whether he thought his wife called counsel after that date. Defendant's wife was neither present at the evidentiary hearing nor called to testify.[6]

The Government presented the testimony of Defendant's former counsel, Charles Lammers. Mr. Lammers, who was no longer with the office of the Federal Public Defender as a result of sequestration (but was at the time he represented Defendant), testified that it was his standard procedure to advise clients of their appellate rights. He explained that in the case of a defendant who was not remanded to the custody of the U.S. Marshal immediately after sentencing, he would take the defendant into his office to advise the individual of his right to appeal, discuss possible issues that could be raised on appeal, and discuss potential risks of appeal. Counsel stated that he would ask the client to give a firm answer at that time, but in the event the defendant changed his or her mind, counsel explained to each client how to file an appeal and how to be sure counsel was notified of the client's desire to do so. Mr. Lammers also testified that he also would typically talk about possible appeal issues upon reviewing the PSR with each defendant before sentencing.

The Assistant United States Attorney ("AUSA") provided Mr. Lammers with a copy of his affidavit for review, and Mr. Lammers noted that he had reviewed the file retained by the Federal Public Defender's office in preparation for the hearing. He explained that his practice at the time was to keep notes about each meeting he had with each client, so he would know "where he was" in the representation and what had already been discussed with each client. The notes in the file were made contemporaneously with the events, or soon thereafter.

Counsel testified that, as was his practice, he met with Defendant Hernandez in his office immediately after sentencing to discuss appeal rights and the reasons for the sentence imposed. Mr. Lammers recalled that Defendant was unhappy with his sentence but was otherwise polite. Counsel also recalled that Defendant's wife was there at least part of the time, although he could not say for

---

[6] Defendant's counsel (at the evidentiary hearing) noted that Defendant's wife had been advised to call her if she wanted to testify, but that counsel had not received a phone call from her.

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT

certain whether she was present the entire time he met with Defendant.[7] Counsel noted that his conversation with Defendant after sentencing was longer than average because there were so many issues to discuss. He could not specifically say if it was twenty minutes or sixty minutes, but he testified that if someone described it as "less than five minutes," that would be absolutely untrue. During the post-sentencing meeting, counsel addressed the reasons for the sentence imposed, whether there were possible appellate issues, the potential risks of an appeal, and the fact that counsel would not be the one to actually pursue the appeal. Counsel recalled that Defendant vacillated on the issue of pursuing an appeal. Counsel explained that some defendants risked getting a higher guideline range on remand, but that this was only a remote possibility in this case. When asked how he and Defendant left things at the end of the meeting, Mr. Lammers said it was quite clear, despite that fact that Defendant had previously vacillated. Mr. Lammers testified that he directly asked Defendant whether counsel should file the notice of appeal or not, and Defendant said no. Mr. Lammers then told Defendant he would not file the notice of appeal in accordance with this instruction, but he also told Defendant that if he changed his mind to call counsel, come down to the clerk of court to file the notice, and write counsel a letter.

After this post-sentencing meeting with Defendant, counsel had no further verbal communication with him. Counsel did call Defendant to remind him to self surrender, but he did not speak with Defendant and just left a message. Mr. Lammers' next communication was a written response to the appeal inquiry filed by Defendant in February 2012, which communication he mailed to Defendant at his prison address.

Mr. Lammers was asked about the two letters appended to the Government's response, both of which are dated June 25, 2011 (*see* doc. 48-1 at 23, 25). Counsel explained that he did not have his own secretary at the time and that he "set [things] in motion" to get those letters out before the deadline for filing an appeal.[8] Counsel indicated that under ideal circumstances, the letter advising

---

[7] Counsel was in agreement with Defendant that there were no communication issues based on either language or intellect. Mr. Lammers did note that communication problems occurred only if Defendant's wife was involved, without elaborating on specific details.

[8] The judgment in this case was entered on June 8, 2011, thus the deadline for filing a notice of appeal was June 22, 2011.

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT

Defendant that, per his instruction, no notice of appeal had been filed (i.e., doc. 48-1 at 25), would have been prepared the same day as sentencing and sent to his client, and the other letter enclosing a copy of the judgment and advising Defendant of the appeal deadline (i.e., doc. 48-1 at 23), would have been sent when the judgment was entered. In this case, both letters are dated and evidently were mailed to Defendant (by counsel's acting secretary in Gainesville) on June 25, 2011, approximately three days after the deadline for filing a notice of appeal had passed.

Counsel was then asked to refer to the affidavit submitted by Nicole Kirkland, Defendant's wife, in which she stated that she contacted counsel on June 20, 2011, and he told her that he could file the notice of appeal but that someone else would file the actual brief (doc. 32 at 37). Counsel testified that she may have heard that from him during the post-sentencing meeting. He further testified that he did not recall or have any record of the conversation, and that had Ms. Kirkland contacted him his response would not have been as set forth in her affidavit. He would have told Ms. Kirkland that he needed to talk personally to the Defendant because the decision regarding an appeal was for Defendant to make. He also noted that if the spouse of a client who was in custody had made this request, he would have gone to see the client.

Mr. Lammers testified that after he sent the letter(s) of June 25, 2011, he heard nothing else from Defendant or his wife until the 2012 inquiry. Counsel was asked, hypothetically, what he would have done if he had learned after the deadline that Defendant wanted to file an appeal. Counsel said he would have immediately called the office of the United States Attorney and spoken with AUSA Littleton (the prosecutor on Defendant's underlying criminal case (*see* doc. 55 at 2)) about filing an out-of-time appeal to see if she would allow it.

On cross-examination, counsel was asked whether his lack of a "local" secretary could have interfered with his receiving a message from Defendant's wife.[9] Counsel said unequivocally that whoever answered the phone would have gotten the message to him or would have referred the call to his voicemail.

Factual Conclusions

---

[9] This is relevant only to Ms. Kirkland's allegation that on June 16, 2011, she called counsel and her call was not returned. She alleges she actually spoke with counsel on June 20, 2011.

After reviewing the record and assessing the testimony presented at the evidentiary hearing, the court determines that counsel's explanation and well-documented recollection of events was credible. The court thus rejects Defendant's assertion that he told counsel to file an appeal. In addition to observing the demeanor of the two witnesses, the court notes that Defendant's actions were inconsistent with those of an individual who had told counsel to appeal. Defendant admitted that he had received counsel's letter of June 25, 2011, in which counsel stated that he did not file an appeal, but he did not follow up with counsel, even though he had time to do so before his self surrender on July 5, 2011. Furthermore, Defendant's credibility is called into question by his filing the "Motion of Inquiry" in February of 2012, which he filed after he admittedly knew that no appeal had been filed. Defendant's decision to file this motion was obviously disingenuous, if not utterly designed to deceive or mislead the court. Finally, the court finds suspect the allegations in the affidavit submitted by Defendant's wife. Key parts of Ms. Kirkland's affidavit are squarely contradicted by the credible testimony of counsel, and Ms. Kirkland did not testify at the hearing to provide greater detail about the facts set forth in her affidavit. Although the fact that both of counsel's post-sentencing letters are dated June 25, 2011, apparently due to issues with support staff in the Federal Defender's Office, is unfortunate, this does not detract from the court's ultimate conclusion that neither Defendant nor his wife contacted counsel after the post-sentencing meeting/discussion to indicate that Defendant had changed his mind and wished to appeal. Therefore, Defendant is not entitled to relief.

**Ground Two: <u>Failure to Argue Entrapment Defense</u>**

Defendant's second ground for relief is that counsel was constitutionally ineffective because he failed to argue that Defendant was entrapped or persuaded into committing the charged offense conduct due to the actions of law enforcement and the two confidential informants. He also argues that this issue should have been raised on appeal.

Counsel's affidavit reflects that he thoroughly considered the defense of entrapment, but that the evidence simply did not support it (doc. 38-1). Even if counsel had been mistaken, Defendant admitted on the record under oath during his re-arraignment that he understood that by entering a plea of guilty, he would be giving up any defense he might have to the charges against him (doc. 55 at 8). After voluntarily waiving his right to assert the defense of entrapment by entering a plea of

guilty, Defendant cannot now claim that counsel was constitutionally ineffective for his failure to assert it.

**Ground Three:** <u>**Failure to Discuss Immigration Consequences of Plea**</u>

Defendant argues that counsel was constitutionally ineffective under the Supreme Court's decision in <u>Padilla v. Kentucky</u>, 559 U.S. 356 (2010) in that counsel failed to warn Defendant of the immigration consequences of his plea. In <u>Padilla</u>, which was decided on March 31, 2010, the Supreme Court held that the Sixth Amendment requires criminal defense attorneys to advise their non-citizen clients about the deportation consequences of a guilty plea.

<u>The Written Record</u>

Counsel states in his affidavit that the notes in his file reflect that during three face-to-face meetings with his client on February 13, 2011, February 14, 2011, and March 4, 2011, before Defendant entered his guilty plea on March 16, 2011, counsel told Defendant that a conviction or plea on any of the counts would result in his deportation (doc. 38-1).

In Defendant's reply, which was sworn under penalty of perjury, Defendant asserts that deportation was not discussed during any of the three meetings cited by counsel (doc. 40 at 10, 14). Defendant states that it was only at sentencing that counsel informed him about the likelihood of deportation, after the plea agreement had been signed (*id*. at 13).

The court notes that the issue of deportation was not raised at Defendant's re-arraignment. When the court asked Defendant where he grew up, he responded "Dover, Florida" which is near Tampa (doc. 55 at 4–5). Thus the issue of his foreign citizenship did not come to light on the record at that time. The PSR indicates that Defendant came to the United States to live with his father, who was married to a U.S. citizen, when he was four years old and that he "always believed that he was a U.S. citizen" (PSR ¶ 45). However, Defendant's assertion that the issue of deportation was not raised until sentencing is called into question by the fact that his employer wrote a letter of support indicating that Defendant was a good employee and that his employer supported Defendant's "appeal against deportation" (PSR ¶ 55; doc. 23 at 18).

<u>The Evidentiary Hearing</u>

Despite his professed belief that he was a U.S. citizen, Defendant testified that he possessed a green card (permanent resident alien card) for a long time. He admitted that he was aware that if

he was convicted of a felony he could be deported, depending on the felony, because some felonies were deportable offenses and others were not. Defendant testified that he asked Mr. Lammers a question about immigration consequences, and counsel responded that he was not an immigration attorney. Defendant further testified that after reviewing the notes provided by the office of the Federal Public Defender, he did not feel one hundred percent certain of his claim. The court afforded Defendant the opportunity to talk privately with his attorney, after which the hearing resumed.

  Defendant's testimony, even on direct examination, was inconsistent. He initially testified that counsel did not advise him about the immigration consequences of the plea. In response to a direct question from his attorney at the evidentiary hearing, he stated that had he known that he could get deported as a result of his conviction, he would not have entered a guilty plea. Defendant then testified that it was not until after he signed the written plea agreement that counsel talked to him about the immigration consequences of the plea. He clarified that this conversation occurred <u>before</u> he actually entered the plea before Judge Smoak, but after placing his signature on the plea document. He indicated that after he physically signed the agreement he thought that he could not change his mind.

  On cross-examination Defendant reasserted that there was no discussion with his trial counsel about the deportation consequences of a conviction until after he signed the plea agreement but before he went before the district judge to enter his plea. He did admit that counsel discussed the deportation consequences but stated that this did not happen until immediately after he signed the written plea agreement. Defendant reiterated that his claim was that counsel did not discuss the deportation consequences before he signed the plea agreement. He testified that he had seen counsel's notes but had no memory of having discussed immigration consequences with Mr. Lammers one time, much less three times. When the AUSA asked Defendant if Mr. Lammers had given Defendant a copy of a list of offenses that were deportable, Defendant stated he did not recall. Defendant then testified that he thought Mr. Lammers had made the comment about not being an immigration lawyer during the last of the three meetings referenced in counsel's affidavit. Defendant acknowledged that before signing the plea agreement, he spoke to an immigration attorney, who advised him that he should not plead guilty. Thus, Defendant admitted, even if Mr.

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT

Lammers failed to advise him about the immigration consequences of a guilty plea and conviction, Defendant had been fully apprised of the same by a legal professional who specialized in immigration law. Defendant agreed that he knew of the deportation consequences well before he entered his plea.

On redirect examination, Defendant stated again that he thought once he signed the plea agreement it was a "done deal" and he could not change his mind.

Mr. Lammers testified that it was his normal practice to discuss deportation issues with his clients. Counsel said that he knew Defendant was subject to deportation because he had "looked it up." Mr. Lammers related that he shared the deportation information with Defendant by making a copy of the list of aggravated felonies and giving it to Defendant early on in his representation of him. Counsel noted that the prison sentence Defendant faced was not as harsh as the collateral consequences he would face if he was deported, due to the fact that Defendant had a wife and four children who were all U.S. citizens.

As noted above, counsel reviewed the affidavit he submitted in opposition to Defendant's § 2255 motion and the Federal Public Defender's file prior to the evidentiary hearing. Mr. Lammers explained that it was his standard procedure to read the plea agreement and statement of facts line by line to his clients to be sure there were no questions. Counsel acknowledged that there was no mention of deportation in Defendant's plea agreement. Nonetheless, counsel testified he was absolutely sure he had discussed the deportation consequences with Defendant before Defendant entered his plea, both because he had notes to that effect, and because counsel specifically remembered downloading articles from the internet for Defendant about families who lived separated by international borders. Counsel explained that he wanted to show Defendant that his family could remain intact.

In addition to Mr. Lammers' specific notes about telling Defendant about the deportation consequences of a conviction, counsel also had written notes reflecting that Defendant told him he had contacted another lawyer about immigration issues. Counsel explained that he intentionally left the information about the other lawyer out of his affidavit, because he did not want to invade any attorney-client privilege that may have existed between Defendant and the immigration attorney.

So, counsel again reiterated that he had no doubt that Defendant had been advised and was well aware of the deportation consequences.

Factual Conclusions

The court finds that Defendant's testimony was inconsistent and incredible. The court further finds that Mr. Lammers did discuss the adverse immigration consequences with Defendant prior to the time Defendant entered his plea. Second, even if Defendant had not fully discussed this issue with his appointed attorney, the record is clear that Defendant sought outside advice from a dedicated immigration attorney and thus was fully aware and informed of the immigration consequences he faced as a result of a conviction before signing his plea agreement. Thus, even if Mr. Lammers had not discussed this issue with him—which the court does not find (to be sure, Defendant testified that he discussed this issue after signing the plea agreement but before entering the plea)—Defendant cannot show prejudice and he is not entitled to relief.[10]

---

[10] The court notes that Defendant's false allegations could subject him to a separate charge of perjury (if nothing else—and there certainly is something else in this case—the statements in Defendant's sworn reply directly conflict with his testimony (e.g., in his reply Defendant swore that Mr. Lammers did not inform him of deportation consequences at any time prior to sentencing, but at the evidentiary hearing he testified that Mr. Lammers so informed him after he signed the plea agreement but prior to his plea)).

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT

Case 5:11-cr-00006-RS-EMT   Document 62   Filed 03/03/14   Page 19 of 19

Page 19 of 19

## Certificate of Appealability

Section 2255 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2255 11(b).

After review of the record, the court finds no substantial showing of the denial of a constitutional right. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, it is also recommended that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Based on the foregoing, it is respectfully **RECOMMENDED** that:

1. The amended motion to vacate, set aside, or correct sentence (doc. 32) be **DENIED**.
2. A certificate of appealability be **DENIED**.

At Pensacola, Florida, this 3rd day of March 2014.

/s/ Elizabeth M. Timothy
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control. A copy of objections shall be served upon all other parties. Failure to object may limit the scope of appellate review of factual findings.** See **28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**

Case Nos.: 5:11cr6/RS/EMT; 5:12cv60/RS/EMT